IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DOE and MARK DOE, | §<br>§ | |
| Plaintiffs, | §<br>§ | |
| vs. | §<br>§ | **CIVIL ACTION NO. 4:26-cv-2560** |
| UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, THE INSPERITY GROUP HEALTH PLAN, and INSPERITY HOLDINGS, INC., | §<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | |

## COMPLAINT

Plaintiffs John Doe ("John") and Mark Doe ("M.D."), through their undersigned counsel, complain and allege against Defendants United Healthcare Insurance Company, United Behavioral Health (collectively "United"), the Insperity Group Health Plan ("the Plan"), and Insperity Holdings, Inc. ("Plan Administrator") as follows:

### PARTIES, JURISDICTION AND VENUE

1. John and M.D. are natural persons residing in Collin County, Texas. John is M.D.'s father.

2. United Healthcare Insurance Company is headquartered in Hennepin County, Minnesota and was the insurer and claims administrator, as well as the fiduciary under ERISA for the Plan providing coverage for the Plaintiffs during the treatment at issue in this case. United Behavioral Health is the mental health arm of United Healthcare Insurance Company.

1

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). John was a participant in the Plan and M.D. was a beneficiary of the Plan at all relevant times.

4. Plan participants and beneficiaries were told that United was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.

5. At all relevant times, United acted as the agent for both the Plan and the Plan Administrator for processing claims, communicating with Plan participants and beneficiaries about the status of their claims, and providing relevant documents, records, and other information as ERISA's claims procedure regulations define those terms.

6. The Plan Administrator is the designated administrator for the Plan and has its principal place of business in Harris County, Texas.

7. M.D. received medical care and treatment at BlueFire Wilderness Therapy ("BlueFire") and Telos Residential Treatment Center ("Telos") for several months in 2023. These are licensed treatment facilities located in Gooding County, Idaho, and Utah County, Utah, respectively, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

8. United denied claims for payment of M.D.'s medical expenses in connection with his treatment at BlueFire and Telos.

9. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

2

10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions and because the Plan Administrator is headquartered in Harris County, Texas.

11. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Administrator pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Administrator and its agents to produce within 30 days after written requests documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### M.D.'s Developmental History and Medical Background

12. M.D. was born six weeks premature.

13. Despite being born premature, M.D. met all developmental milestones in a timely manner.

14. He struggled with fine motor skills demonstrated by his poor handwriting and difficulty with tying his shoes.

15. M.D. also was slow to develop social skills and struggled with sensory stimuli such as loud noises making him feel anxious and overwhelmed.

16. M.D. has a lifelong pattern of fixating to an unusual degree on interests. These fixations were problematic for M.D. as he struggled to connect with people who did not share his interests.

17. M.D. tended to be quite rigid in his thinking. Historically, he had difficulty when things don't go the way he expected.

18. He has also struggled with depression since about age eleven. His depression manifested itself as a loss of energy and motivation, isolation, and excessive screen time and sleep.

19. M.D. also struggled with a negative self-concept and low self-esteem and engaged in some self-harming behaviors such as hitting his head.

20. M.D. also endured anxiety and got overwhelmed to the point he could not control his emotions. In addition, parents expressed considerable concern about M.D.'s dishonesty.

21. His early addictive behaviors included video game addiction, sugar addiction and stealing to support his sugar addiction.

22. M.D. also reported passive suicidal ideation and on one occasion made a threat of suicide.

23. Later behavior included lying about drugs, stealing, and other risky behaviors. M.D. progressively showed little interest in academics and his isolation increased.

24. M.D. started meeting with a therapist weekly as a sophomore in high school and his family also completed some family therapy.

25. M.D. first started smoking cannabis in June of 2022 and used the drug two to three time a week, but by the end of the year was doing it every other day. Eventually, it was every day and usually multiple times per day.

26. In early 2023, M.D. and his parents met with a therapeutic and educational consultant, who determined that M.D. needed a therapeutic placement in a sub-acute inpatient setting to address his negative, intense and high risk behaviors like suicide ideation and substance use.

### BlueFire

27. M.D. was admitted to BlueFire on February, 2023.

28. John received multiple Explanation of Benefits statements ("EOBs") from United, which contained the following denial rationale:

> 8L YOUR PLAN DOES NOT COVER THIS THERAPY SERVICE OR ASSOCIATED EXPENSE.

29. On December 13, 2023, John submitted an appeal contesting the denial of coverage.

30. John wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

31. John identified the Plan definition for "Covered Health Care Service" and argued that M.D.'s treatment at BlueFire was a covered benefit.

32. He explained that these services were provided for the purpose of diagnosis and treatment of M.D.'s behavioral health conditions (he has been diagnosed with generalized anxiety disorder, persistent depressive disorder, and attention-deficit/hyperactivity disorder) and attached medical records from BlueFire to support this assertion.

33. He also argued that these services were medically necessary and consistent with generally accepted standards of medical practice including as outlined in United's clinical criteria, the *Child and Adolescent Level of Care/Service Intensity Utilization System* (CALOCUS–CASII).

34. John provided evidence in his appeal letter including M.D.'s medical records from BlueFire, a psychological evaluation, and a letter issued in August 2016 by the National Uniform Billing Committee (NUBC) establishing the 1006 revenue code formally recognizing that outdoor behavioral health programs offer a generally accepted level of care comparable to other intermediate sub-acute inpatient settings.

35. Furthermore, John argued that the Plan provides coverage for inpatient mental health care, including services provided in what the Plan referred to as an "Alternate Facility" and that BlueFire fit within that category.

36. John explained it was clear that BlueFire met the Plan definition of an "Alternate Facility" because BlueFire was a 24/7 outdoor behavioral healthcare treatment program that was duly licensed by the state of Idaho to provide mental health and substance use disorder services to adolescents, as required by the governing Idaho state regulations.

37. In addition, he explained that BlueFire was accredited by a national accrediting agency, which further demonstrated its commitment to excellence in healthcare.

38. John reiterated that as a duly licensed provider offering behavioral health services on an inpatient basis and acting within the scope of its license under governing state law, BlueFire met the above definition of an "Alternate Facility."

39. John argued that although the Plan excluded "adventure-based therapy, wilderness therapy, outdoor therapy, or similar programs" as being "Alternative Treatments," this

exclusion did not apply to medically necessary services like those M.D. received at BlueFire.

40. John expressed concern that the denial of payment for M.D. treatment was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services in the same classification. John identified skilled nursing facilities, subacute rehabilitation services, inpatient habilitative services, and inpatient hospice services as some of the medical or surgical analogues to the treatment M.D. received.

41. John raised concern that the Plan language on its face may impose an impermissible NQTL based on facility type or provider specialty.

42. He argued that by categorically excluding all outdoor behavioral health programs, United unlawfully discriminated against qualified behavioral health providers like BlueFire in violation of the MHPAEA.

43. John requested that United conduct a comparative parity analysis and provide him with physical copies of all documentation used.

44. In addition John asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

45. In a letter dated January 18, 2024, United denied coverage for M.D.'s treatment at BlueFire under the following rationale:

> We have denied coverage for mental health residential, where you live at the facility and get 24-hour care for your condition, as of 02/24/2023. You were being treated for mood disorder and anxiety. Your request was reviewed. We have denied the medical services requested because we reviewed your clinical case notes. The criteria were not met because: After reviewing the available information, it is noted that you were treated in a wilderness therapy program, which is considered unproven and not medically necessary. Wilderness Therapy program is not a covered benefit. Evidence based treatment known to help your conditions was available. The Guideline/Policy/Criteria used for the decision is: The Optum Behavioral Clinical Policy on Wilderness Therapy which is applicable to mental health residential level of care.

46. On May 13, 2024, John requested an external review of the denial of coverage for M.D.'s treatment at BlueFire.

47. John wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

48. John also highlighted United's potential violations of ERISA.

49. For instance, John mentioned the shift in denial rationale from "not covered" to experimental" as an example of the lack of a full and fair review, violating ERISA.

50. Furthermore, John explained that he had requested that United provide him with clear evidence that the Plan is being administered in accordance with the Mental Health Parity and Addiction Equity Act of 2008 as evidenced by conducting a parity analysis; however, United's response to the appeal included none of this crucial information.

51. By withholding these plan documents from him, John wrote that United deprived him of the opportunity to conduct an independent parity analysis himself.

52. John also argued that United failed to issue a meaningful response to the arguments and evidence he presented in his level one appeal.

53. For example, he noted that United ignored his concerns that it was imposing nonquantitative treatment limitations in violation of MHPAEA.

54. Additionally, he explained that United's last denial letter failed to respond to or even acknowledge the arguments and evidence supporting coverage, making it impossible to engage in meaningful dialogue.

55. John requested that the assigned reviewer be a medical or vocational expert who is knowledgeable about generally accepted standards and clinical best practices for outdoor behavioral healthcare programs in the state of Idaho where BlueFire is located, as well as appropriately qualified and experienced in order to provide a meaningful response to the arguments and evidence that he presented in his appeal.

56. John also requested that he be provided with the reviewer's identifying credentials so he would be aware of their ability to accurately assess M.D.'s needs.

57. John further argued that Optum's Wilderness Therapy Policy, a policy referenced in United's denial letter, did not apply to M.D.'s treatment at BlueFire as the policy only referenced outpatient procedure codes and services.

58. He clarified that BlueFire offers intermediate, inpatient, outdoor behavioral health treatment.

59. John argued BlueFire provided inpatient services that were billed using an all-inclusive per diem revenue code, "1006," and was billed on a UB-04 facility claim form, as

required by the National Uniform Billing Committee and, therefore, that Optum's policy did not apply to the treatment that M.D. received at BlueFire.

60. John further argued that M.D.'s treatment was not experimental, investigational, or unproven and that M.D.'s treatment did not align with the Plan's definition of "Experimental or Investigational Service."

61. First, he argued that the services were not subject to FDA approval or disapproval but that because BlueFire was a 24/7 outdoor behavioral healthcare treatment facility that was duly licensed by the state of Idaho to provide mental health and other behavioral services to adolescents as required by the governing Idaho state regulations, it did not fall with the Plan exclusion language.

62. In addition, he noted that BlueFire is accredited by a national organization, which further demonstrated its commitment to excellence in healthcare.

63. Second, he explained that several comparable outdoor behavioral health programs had been reviewed by independent review organizations and had been confirmed to be safe and effective.

64. Third, he noted that the services provided to M.D. at BlueFire were not the subject of an ongoing clinical trial.

65. Because of these reasons, John argued that M.D.'s claims for BlueFire did not meet the Plan definition of an experimental or investigational service.

66. Further, John argued that M.D.'s treatment at BlueFire did not meet the Plan definition of "Unproven."

67. He explained that outdoor behavioral health treatment has been determined to be effective and beneficial for behavioral health conditions due to significant clinical

evidence and published peer-reviewed medical literature, some of which he provided with the appeal.

68. In addition to this evidence, John attached a number of redacted clinical attestation letters confirming the safety and efficacy of outdoor behavioral healthcare.

69. M.D.'s own clinicians also provided their attestations for the efficacy of outdoor behavioral health treatment as it related to M.D. and the medical necessity of the services he received at BlueFire.

70. John expressed concern that the denial of payment for M.D. treatment was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services in the same classification.

71. John identified skilled nursing facilities, subacute rehabilitation services, inpatient habilitative services, and inpatient hospice services as some of the medical or surgical analogues to the treatment M.D. received.

72. John argued that United was imposing an impermissible as-applied NQTL based on experimental/investigation medical management standards and that by categorically excluding all outdoor behavioral health programs, United was unlawfully discriminating against qualified behavioral health providers like BlueFire in violation of the MHPAEA.

73. In a letter dated July 25, 2024, the independent review organization, MES, denied coverage for M.D.'s treatment at BlueFire, under the following rationale:

> The requested Residential Mental Health Services, provided by Blue Fire Wilderness Therapy, dates of service 2/24/2023 through 6/7/2023, is unproven in this case, and is not medically necessary in this case.

**Telos**

11

74. M.D. was admitted to Telos in June, 2023.

75. In a letter dated March 12, 2025, United denied coverage for M.D.'s treatment at Telos under the following rationale:

> Based on my review of the request, including any supporting documentation which may have been submitted with your appeal letter, I have determined that the submitted claim(s) for date(s) of service 06/08/2023 through 10/16/2023 have been partially approved for payment. Per Program & Network Integrity (PNI) Review, medical records submitted supports the service billed.
>
> However your Insperity Holdings, Inc. Summary Plan Description requires that authorization be obtained from United Behavioral Health (UBH) prior to delivery of Mental Health Residential Level of Care. Based on the information provided, there is no evidence that there were extenuating circumstances preventing you from obtaining, or from confirming that the member had already obtained prior authorization/notification for the service(s). No further payment will be issued.

76. On April 24, 2025, John submitted a level one appeal contesting the denial of coverage.

77. John explained that he had not previously submitted an appeal but had simply provided medical records, as requested by United, and had explicitly told United it was not an appeal.

78. Furthermore, John argued that the Plan provisions clearly stated that the penalty for failure to obtain prior authorization was not a complete reduction in benefits.

79. In fact, the plan stated that if John did not obtained prior authorization, "the amount you are required to pay will be increased to 50% of the Allowed Amount; however, the amount of the increase will not exceed $500."

80. John again wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

81. In a letter dated May 30, 2025, United's reviewer informed Plaintiffs that the service would be partially covered, and provided the following rationale:

> Based on my review of the request, including any supporting documentation which may have been submitted with your appeal letter, I have determined that the submitted claim for date(s) of service 06/09/2023 through 10/15/2023 have not been approved for payment and 06/08/2023 through 10/16/2023 have been approved for payment. As per my review, the denial has been overturned for REV Code 1001 for the date(s) of service 9/6/2023, 10/8/2023, 10/10/2023, 10/16/2023 (1 unit each date of service) - Documentation supports service billed. Please process per member benefits.

82. The letter did not make clear what date were approved or disapproved or explain why payment was approved for some dates and continued to be denied for the remainder of M.D.'s treatment.

83. The letter also stated that this was the final determination.

84. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA for the treatment at BlueFire and Telos.

85. The denial of benefits for M.D.'s treatment was a breach of contract and caused John to incur medical expenses that should have been paid by the Plan in an amount totaling over $311,000.

86. United failed to produce a copy of the Plan Documents, including the contract between the Plan Administrator and United and the medical necessity criteria for sub-acute inpatient mental health and substance use disorder treatment as well as the medical necessity criteria for skilled nursing or rehabilitation facilities, despite John's request.

87. After United repeatedly failed to produce the requested documents, John made one last attempt to obtain them by sending a letter dated December 11, 2025, directly to the Plan Administrator. Specifically, John asked to be provided with:

13

• Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my child, [M.D.], at Bluefire Wilderness Therapy, copies of those individuals' curriculum vitae, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [M.D.'s] claim;

• A complete copy of both the medical necessity criteria utilized by United Behavioral Health in determining that [M.D.'s] treatment was not medically necessary and that treatment for [M.D.] at a lower level of care was appropriate;

• A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;

• Copies of documents identifying the self-compliance analysis the Plan and United Behavioral Health have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.

• Complete copies of any and all internal records compiled by United Behavioral Health and Insperity Holdings, Inc. in connection with [M.D.'s] claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;

• A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [M.D.'s] insurance plan is operated;

• Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and United Behavioral Health; and

• Copies of any and all documents outlining the level of accreditation required for residential treatment programs;

• Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and

• Copies of documents identifying the process, strategies, evidentiary standards, or other factors the Plan used to determine that the treatment at Bluefire Wilderness Therapy was experimental and investigational.

• Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to determine whether treatment at sub-acute inpatient programs for medical or surgical treatment is experimental and investigational.

• Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

88. As of the date of the Complaint, neither the Plan Administrator nor United has responded to the letter.

## **FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B)
Against United and the Plan)**

89. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

90. United and the Plan failed to provide coverage for M.D.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

91. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

92. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled.

93. United failed to substantively respond to the issues presented in John's appeals and did not meaningfully address the arguments or concerns the Plaintiffs raised during the appeals process.

94. In fact, United's denial letters rely on formulaic recitations and do not address the arguments raised by John in any capacity.

95. United and the agents of the Plan breached their fiduciary duties to M.D. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act

15

solely in M.D.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of M.D.'s claims.

96. The actions of United and the Plan in failing to provide coverage for M.D.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

97. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P.8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3) Against United and the Plan for Treatment at BlueFire)

98. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

99. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

100. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

101. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

102. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for M.D.'s treatment at BlueFire include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

103. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on well accepted research, clinical and accreditation standards, licensing status, and generally accepted standards of medical practice.

104. United and the Plan evaluated coverage for M.D.'s mental health claims at BlueFire by improperly employing these standards and criteria. Specifically, United ignored the research showing the efficacy of treatment of outdoor behavioral healthcare, the NUBC coding for outdoor behavioral healthcare, the state licensure of BlueFire, and the general acceptance with the behavioral and mental health community of outdoor behavioral healthcare.

105. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

106. United denied M.D.'s outdoor behavioral health treatment in large part on the basis that it was experimental or investigational. The National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

107. Plaintiffs are aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by United.

108. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the coverage criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

109. United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

110. In fact, despite John's request that United and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, United and the Plan have not provided John with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, United and the Plan have not provided John with any information about the results of this analysis.

111. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the facility criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants due to of their violations of MHPAEA;

(e) An order requiring an accounting of the funds wrongly withheld, by each Defendant, from participants and beneficiaries of the Plan because of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably stopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA;

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA; and

(i) An order requiring the Defendants produce the self-compliance analysis upon request as required by MHPAEA.

112. The remedies the Plaintiffs seek under MHPAEA are not available under ERISA even if

they are successful in obtaining remedies for wrongful denial of the Plan benefits.

113. For example, declaratory relief, reformation of the medical necessity criteria, or an order enjoining the Defendants' use of improper criteria for evaluating coverage of BlueFire are not available as remedies for a wrongful denial of plan benefits.

114. In short, remedies for the Defendants' violations of MHPAEA may only be provided by appropriate equitable relief under 29 U.S.C. § 1132(a)(3) rather than 29 U.S.C. §(a)(1)(B).

### THIRD CAUSE OF ACTION

**(Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c)
Against the Plan Administrator)**

115. United, acting as agent for the Plan Administrator, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health and substance use disorder treatment, and the medical necessity criteria for skilled nursing and rehabilitation facilities.

116. In spite of John's requests during the appeal process for United to produce the documents under which the Plan was operated, and his instructions to forward that request to the appropriate entity if United was not acting on behalf of the Plan Administrator in this regard, United repeatedly failed to produce to the Plaintiffs within 30 days after written request documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health and substance use disorder treatment, and the medical necessity criteria for skilled nursing and rehabilitation facility treatment.

20

117. After United repeatedly failed to provide these materials, John sent one final letter dated December 11, 2025, to both United and the Plan Administrator again requesting the documents which he was statutorily entitled to receive upon request. United and the Plan Administrator did not comply with John's request for documents.

118. The failure of the Plan Administrator and its agent United, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of JOHN's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties up to $110 per day on the Plan Administrator from 30 days from the date of each of these letters to the date of the production of the requested documents.

119. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.      Judgment in the total amount that is owed for M.D.'s treatment at BlueFire and Telos under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.      Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.      For an award of statutory penalties of up to $110 a day against the Plan Administrator after the first 30 days for each instance of the Plan Administrator and its agent United's failure or refusal to fulfill their duties, to provide the Plaintiffs with the documents they had requested;

4.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

21

5.      For such further relief as the Court deems just and proper.

DATED this 31st day of March, 2026.

By _____s/ Brian S. King_____

Brian S. King
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
Attorney for Plaintiffs

22